The case this afternoon is 14-1617 Letzmark International v. Impression Products. Mr. O'Connor, you're splitting, giving Mr. Pincus ten minutes, and you're giving ten minutes for rebuttal, correct? That's correct. Okay, please proceed. Okay, thank you. May it please the Court. This case has been presented to us with respect to two separate issues. I'd like to make a brief comment about the second issue, which I don't think was discussed in our briefs. And that is, I was looking at it the other day, and the question is that when a sale is made under a restriction that is otherwise lawful, and the next phrase is, and within the scope of a patent grant, and on rereading the cases, I failed to find any cases, although I could have missed some, where a restriction was held to be within the scope of the patent grant. And I think the case which discusses this best is Motion Picture Patents, where they talked about what is the scope of the patent grant, which, of course, is the four corners of the claims. And every attempt to restrict or control or give added value to that on the part of a patentee has been held to be invalid, is outside the scope of the patent grant. Next. Can I ask you a question? Is there any Supreme Court case involving a patentee sale subject to a single-use restriction? I don't believe – I think – I believe all of the sales were by people who had licenses from the patentee. So we have a lot of relevant Supreme Court precedent, but nothing directly on point or holding on the facts we have here. Well, except for the fact that we have multiple cases, including Jeff's photo, describing an authorized sale, as a sale either by the patentee or the patentee's licensee, which is authorized by the patentee. As a matter of law, they stand on the same footing. I don't think there's any real controversy about that. So is that – I'm trying to get to the point you're making here, where you said this – are you arguing that this particular restriction falls outside the bounds of the patent grant? In Mallinckrodt, in the case at Barr, and in every case that I know of, the restriction was an additional benefit to the patentee outside the scope of the claims. In other words, the patent grant allows you to sell something or restrict – not to sell, but to prevent others from selling a product that reads on the patent claims, or the claims read on the patent. I always get those two confused. So once you're outside of the four corners – so I can tell you something. If I have a patented product, I give you a license to sell that product. That product alone is described in the four corners of the claims. Every claim element is there. If you go beyond that – remember, we're talking patent law, not contract law. If you go beyond that and say, and incidentally, when you use that patented product, only I can repair it. Only I can provide the ink. Only I can – you can only use my films in conjunction with your projector. What I've done is gone outside of my four corners of my claims and claimed for myself under the patent law some additional value or benefit in restrictions on what you can do with the product, restrictions that are outside the patent grant. So you're saying it's outside the grant to say to Hull and to Mallinckrodt that for health and safety and security, powerful reasons, undisputed, that that's outside of the grant? I am. And therefore, nexus of therefore, that there's no logical basis to support it, or that it doesn't matter? No, I don't know what I'm saying. First of all, you can certainly control what someone does with a product. You can control all the health and safety issues by contract. They're also by federal law in many cases. But that's not the role of the patent law. You're saying it's the same result but a different rationale. No, it's not the same result. Because the problem is – You said you can control it by contract. Yes, you can. But that's not the same result. Because the issue almost always in these cases comes down not to the purchaser and the seller. It comes down to somebody who buys from the purchaser. And that would not be covered by the patent, by the contract, because there's no privilege. You're a patentee and you sell a product. Right. You are exhausting the rights given to you under the patent. Right. Judge Rich used to argue with me and say, there's no exhausting. We know what you mean. But when you sell it with a restriction, you are exhausting all of your rights but perhaps one. Why can't you do that? Well, because, first of all, the case law is very clear. I mean, this goes all the way back to the 1800s. Once you sell it, you cannot restrict the use by the person who bought it using the patent laws. Well, how do you reconcile that with the Supreme Court's decision in general of Talking Pictures Corporation, where it didn't just hold the licensee guilty of infringement, but also held the end user, who used it in a way that was outside the scope of the license, also guilty for infringement? And both of those are under the patent law, not under contract doctrine. So how do you reconcile your view with that Supreme Court decision, which was bound by? That was not an authorized sale. That's a simple answer. It wasn't an authorized sale. I thought you just said you can't limit the end user in terms of their ability and what they might use it for. If there's an authorized sale by the patent dealer, perhaps he's a licensee, then your rights in the patent rights are exhausted at that time. This was not an authorized sale. Well, it depends how you define authorized sales, doesn't it? I mean, you're saying an authorized sale. What if there are conditions on that sale? So would that take it out of the world of authorized sales? Yes. If it's an authorized sale, that means it's a sale by the patent dealer or the licensee. That's what an authorized sale by definition means. Without conditions? With or without conditions. An authorized sale is a sale without any conditions, any restrictions associated. That's right. If the licensee doesn't have the right to sell the product, then by definition he's not authorized, so the sale is not authorized. It's just like a thief can't pass a good title. An unauthorized licensee who is only licensed to sell to A, and he sells to B, B is buying a product which is unauthorized. And also in that, just real quickly, the purchaser in that case knew about the license restrictions. The court didn't say it was turning on that, but they did make a point of mentioning that. Let me ask you a question. Maybe I'm unnecessarily confused. You've got two issues here, and they were decided differently below. You are arguing first because you're a pellant. It sounds to me, correct me if I'm wrong, like you're defending the position you won on before, whereas what you lost on was international exhaustion. That's right. But you're arguing now to defend the position on which you won. That's right. We had to discuss both, so I went with that one because I was particularly noted that language I wanted to bring forth. But do you understand under general talking pictures that a patentee is allowed to use patent law, that's the same from contract law, use patent law as a vehicle for suing a licensee that exceeds the license? Correct. And so a patentee is allowed to convey a license with limitations on use, for example. To the licensee, yes. So if a patentee can convey to a licensee a limited use, you may only use this for private, not commercial purposes, and if you sell it to anyone else, you can only allow them to use it for private, not commercial purposes. Then what possible logic or basis is there in saying the patentee can't similarly restrict the end user? First of all, I agreed with you too quickly. I disagree with that. If you sell to somebody and say, I'm giving you whatever, I'm giving you time, because it requires a conveyance of title. And I'm telling you that this is the only way in which you can use that product. But you're of the belief that a license conveys title? No. Okay. But if you receive something when I give it to you, now I can either give you title or I can lease it to you. But if you sell it to me, you're giving me an implied license by that sale, aren't you? No. If I sell it to you, you don't get a license. You own the property. It's an implied license to do with it what I want. Well, I think that's just, with all due respect, that's wordsmithing. I don't think it makes any difference what you call it. The legal fact is, if you get it, it's yours, and you can't be sued for using it under the patent laws. And when you buy something, you look on the shelf and say, oh, it's got a patent number on it. I might get sued for patent infringement down the line somewhere. You buy it. You have an expectation that it's yours and you can use it. But you buy it. You're talking about having an expectation. You buy it. Someone owns a bundle of patents. They can convey them all or they can convey some of them, correct? Yes, if you're selling a patent, yes. Patent, not a product. All right, so you're saying that if I sell a product and I tell you I'm selling you this product and I'm giving it to you for a cheaper price in return for your promise to only use it in one way as opposed to another, that that restriction, you can agree to it, but it's not enforceable except by contract. That's right. I think that's what the case law supports. Okay, what case do you think is most strongly in support of that? I think motion picture patents is probably the best articulated. And this court in the LifeScan case said we're not supposed to be concerned with how much value a patentee gets for selling something. The Supreme Court in Kurtz's copyright case said pretty much the same thing. We don't look to how much value the patentee gets when he departs with his ownership of the property. And this goes back to your question, Your Honor. Putting a restriction on the use of a property, that was specifically addressed in the case of Bowers, not Bowers, the O'Donnell case, Bowers v. O'Donnell. And the court specifically addressed that. They said selling something is something, and then saying, oh, and incidentally, I'm just giving you a license and there's a restricted use. That's just playing games with words. If you sell it, you sell it. And saying, oh, I'm calling my sale to you a license, doesn't make it a license. I think I made that point in my brief as well. Why don't we reserve your rebuttal time and we'll hear from you again. Okay, thank you. Thank you, Your Honor, and may it please the Court. I'd like to turn to the jazz photo issue, if I may. In art, the starting point for that question is the common law, and there's no doubt about what the common law rule is because the Supreme Court told us. Why isn't the starting point what the Supreme Court actually was interpreting in Kurtz's saying, which is 109A, which, among other things, prescribes by text a rule defining what rights are lost. And in that text, it has zero room for giving any consideration to sale location, which is why there was no meaningful discussion in Kurtz's saying of sale location. It was all about manufacture location, and it's why the Court was able to say there was this very stark choice of consequences. Either there is exhaustion on a foreign sale, or there is never exhaustion, even on a U.S. sale, so that the copyright owner retains rights, I think the Court's language was perpetually. We don't have any of that here. We don't have a text. Well, and respectfully, Your Honor, I think that makes this an easier case because I think what the Supreme Court said was our starting point is the common law, and it pointed out that in the 1909 Copyright Act, there was no restrictive language, and then it looked at the language in the 1976 Act to see if it restricted the common law rule. I think that's the way the analysis flowed. But the Court said several times, and even if it hadn't said it, it would be obvious. It was interpreting a text, 109A and its predecessor. Location of sale was completely irrelevant to that text. We're not interpreting a text. We have to. We're obliged to. We don't have any choice but to try to figure out what is the non-textual exception to the otherwise clear 271A right of exclusivity right as to use control. So how is it that we are bound by some interpretation of a text that's not before us? I don't think you're bound by the interpretation of a text, Your Honor. I think the relevance of Kurtzang is what it said about what the background common law rule was. Of course, the elephant in the room was that Kurtzang was a copyright case. It was. It was, Your Honor. But the common law didn't draw such distinctions, and both this Court and the Supreme Court have relied on Lord Cope's statement of what the basic rule was about chattel. Mr. Pinkerton, I'd like to know what you think of the government's suggested position, the notion that patentees have the right to reserve, if they do so clearly, the importation into the United States. Because your position was different than that. Yours was, no way, you're done, you don't get to do it, can't reserve anything, international exhaustion all the time. And the government's position is more moderated. So I'd like to know what your view is about their position. It is more moderated, and we're glad they go part way, but we disagree with them for not going the entire way. Because I think that kind of reservation is similar to the problem in the second issue of the case, which is sort of statutory reservations of rights in connection with a fail, with transfer of title, and the extent to which those reservations can apply to the downstream users. That's the problem, and what the government is suggesting here is really just another variant. Can I characterize your statement as suggesting you speak from hypocrisy in the way that they presented their two arguments, the government? Well, I don't want to... That's what you seem to suggest, right? I would not go with you on Mallinckrodt, I'd not go with you on Jasphoto. It's hypocritical. That's the argument you just made, isn't it? Well, I don't want to... You don't like the word, but isn't that the argument you just made? Well, let me answer in two ways. I think the arguments are inconsistent. I think the arguments are inconsistent. I do think, in their basic assumptions, I think it wouldn't be impossible to draw a distinction between territory and the other issues, and I guess what I said, I don't want to get diverted into the discussion of the other issues, but it seems to me, if you look at the Supreme Court's decisions in Quanta and Univis, Mallinckrodt and some of its even earlier decisions, the Mallinckrodt rule is squarely inconsistent with those decisions. So, if there's a problem with the government's positions, I think it's a problem with its Jasphoto position, not a problem with its Mallinckrodt position. So, you think the two, really, because the logic of what you're arguing, the two issues need to rise and fall together. I think that's the most logical approach, Your Honor. As I say, I don't think it would be inconceivable to say, for example, that in the... There are sort of three situations in the foreign sale context. So, let me... One is where there's the sale, the foreign sale is by the U.S. patentee or some affiliate of the U.S. patentee, right? In that situation, we think it's the clearest case where a reservation of rights is most equivalent to Mallinckrodt. At the other end of the spectrum, there's a situation where the sale, the foreign sale is pursuant to a license or is by the foreign patentee who is totally unrelated to the U.S. patentee. In that situation, obviously, it would make no sense to have exhaustion. You have a sort of a middle situation where the foreign sale is by a third arm's length licensee of the U.S. patentee and the question there is, which box does that fall in? I think you could make an argument that the territorial situation is different from the other situations where at least the U.S. patent is on the scene because it's a sale in the U.S. So I think the most logical thing would be to put them all in the exhaustion bucket, but I don't want to leave the court with the impression that there would be no basis to draw the distinction. If you could turn on what was authorized and what wasn't and essentially following Mr. O'Connor's comment, what you're allowed to not authorize, if that makes sense. Well, I think the question in these cases always is, was the sale either by the patentee himself or if by a licensee, was the sale within the terms of the license? Once you have the sale that's authorized, I think that's the end and the patent rights are exhausted. There's no ability to preserve them, to impose them on the downstream user. Suppose you have a situation in which there is no foreign patent law or no foreign patent protection for the good and it is nonetheless sold by the patent holder with the U.S. patent holder. How does that come out? To be honest, Your Honor, I haven't thought of that hypothetical, but I guess what I would say is that that's analogous to the situation where there's still a sale by the U.S. patentee. It seems to me, in most of these situations, just to step back and look at the practicalities for a minute, there's still, well, on the legal side, there still is a sale by the U.S. patentee and it seems to me that sale transfers, exhausts the patentee's rights in the good. It's certainly not a sale under the patents, under Jeff Stark's hypothesis. There's no patents. Well, there is a U.S. patent. Yeah, but the sale was in a foreign country. But that will always be, even when the U.S. patentee, even when the seller owns the worldwide rights and the sale is in Germany, the sale is under the German patents, we would say that there's exhaustion because the patentee is one and the same. In this situation, the patentee is still one and the same. Obviously, this is not the situation in this case, I want to add, but it does seem to me that logic sort of pushes it toward the exhaustion category. You know what's so troublesome about these cases? We get wrapped up in generalizations and we forget what we're talking about. So let me bring you back to the fact in Mallinckrodt. The restriction on reuse was for a product, a nebulizer, which in use gets filled with pneumococcus and other deadly bacteria and viruses from the lungs. So the producer says, you can't reuse this, you will kill everybody. And here we are saying that's not allowed. Such a restraint is not allowed. Don't we have to allow our evolution of the law to recognize the complexities of practice and the same philosophy would apply to the foreign sales for the reusable chemicals. At least there was a very strong argument that once the case is destroyed and you put it together and use it again, that perhaps it's the customer who's being injured, not the purveyor. And yet I hear from everybody there should be one rule that fits all. I think experience shows the evolution of the cases before us, shows that one rule does not fit all. But is your position, never mind, we'll simplify it, you can't do it? Well, our position is you can't do it under the patent law. Obviously, if there are public health problems, there's lots of other regulatory authorities that deal with them, but the patent law has to deal with the range of situations. But if you can't have a restriction under the patent law, we know field of use licenses are permitted. You're saying you can have a field of use exclusive license, but you can't have a field of use sale? Once there is a sale, once there is a transfer of title that is authorized by the patentee, that exhausts the patent rights and a downstream user, there might be contract remedies, maybe, I don't know, but the patent rights are exhausted. And if I may just respond briefly. It says on your sales document, single use only or you will kill everybody. That's precisely the kind of conditional sale argument that the Supreme Court rejected in Quanta and Univis. And the problem is, for the examples in the health... There was no condition in Quanta. There wasn't in Univis. Oh, did you just say Quanta? Well, Quanta said... Quanta's statement of the exhaustion rule left no room for conditional sales. Having just reiterated General Software Pictures and said, we don't have that because we absolutely have no conditions on LG's authorization of Intel to sell. But even if there had been... I think that is why the sale exhausted all of the rights, because the first question is, is there an authorized sale? Just like in Curtis, the question was, was the British government authorized to sell the planes? Once they were authorized to sell the planes, even though the only patents that the patentee had were Canadian patents, it didn't matter. So all of the patentee's patent rights were exhausted. Thank you, Your Honor. We'll hear from the government, Ms. Patterson. Thank you. May it please the Court. Melissa Patterson for the United States. In the government's view, the inquiry on both questions the Court posed should be the same. And that's whether, has there been a sale authorized under the U.S. patent? And if so, then all post-sale conditions the vendor attempts to impose are invalid. Ms. Patterson, can we get back to General Software Pictures? I'm just trying to understand. In terms of real-world ramifications there, the purchaser purchased an amplifier that was encumbered and restricted to a certain use. Is that right? I don't think that's quite right. I don't think that's the point of General Software Pictures. The purchaser bought unauthorized. If the purchaser used that amplifier for commercial purposes, then the purchaser would be liable for patent infringement. Isn't that what happened in that case? Yes, but only, and only because it was an unauthorized sale, that licensee could not sell to people he knew were going to use for commercial purposes. And, of course, an unauthorized sale, no one thinks an unauthorized sale exhausts any patent rights. So I think if the setup had been in General Software Pictures, you licensee have a license to sell to people who tell you they're only going to use for commercial purposes or not going to use for commercial purposes. If someone lies to you, I think it's still an unauthorized sale, as long as you fulfilled whatever license terms there were about ensuring you were selling within the scope of your license. Then I think the rights would have been exhausted. Now, as a patentee, I can require my licensee to extract contractual promises from purchasers, and if the purchasers then turn around and do something with it, they say they're not going to, there may well be contractual penalties. They, of course, would be in privity. But you don't have a patent condition attached to that good that has been sold with the authorization of the U.S. patentee. So you're saying if the patentee chooses to sell directly and say, I'm only selling for Purpose A but not for Purpose B, that's not enforceable. But the patentee can tell them, but if they go through a licensee and take the added step and the added expense, then they can enforce any violation by the downstream user under the patent law. No, Your Honor. And this is a key point. I think Lex Mark misunderstands our position. We don't think anyone, a patentee or a licensee, can impose a post-sale condition on the article itself as a matter of patent. Again, as a matter of contract law, they may be able to, but not as a matter of patent law. Now, what the patentee can do is tell its licensee, you can only act. You're only authorized. But in general talking pictures, the remedy that they afforded was an infringement. Because it was an unauthorized sale, that licensee was just as if a stranger had come along and sold to the purchaser something for which it did not have the patent rights to because he was acting outside the scope of his license. Again, we don't think anyone, licensee, patentee, can impose a post-sale condition, but you can make licensees limit themselves, limit their sales in any way the patentee himself would be acting. He's standing in the patentee's shoes. So when you have a licensee standing in your shoes, you can restrict them in the same way that would be lawful for you to restrict yourself. And if they go outside of it, then yes, they've infringed, they've sold outside the scope of their license, they've made an unauthorized sale, and that good, the rights in that good have never been exhausted. Now listen, Madison, even though you agree that patents are territorial, you're arguing for international exhaustion. You seem to have endorsed a couple of lines of your brief. The default position where there can be exhaustion, there should be exhaustion if one can reserve rights. Isn't that inconsistent with your position with respect to Malabar where rights were reserved? No, Your Honor, and I think this is a key point. You can't slice and dice up your U.S. patent rights and have certain patent restrictions follow an article, but your U.S. patent rights are entirely divisible, entirely separate from any foreign rights you might have. And we think that this rule is pretty well fleshed out in the common law cases that deal with this exact problem. Now there aren't that many cases, but all of the cases that exist point to the rule that we've articulated in our brief. If you are someone who holds both U.S. and foreign patent rights and you're selling an article abroad, if you are silent, the purchaser gets to assume... What happens if you don't have foreign patent rights? Because, you know, it's really, really expensive to patent all over the world. Do you know how much it costs to file a patent application?  How could you be here and not know how much it costs to file a patent application? How much do you think it costs to file a patent application in every country in the world? I don't know, Your Honor, but I don't think it's relevant to the legal point here. How can it not be relevant? I want to know if you don't have a patent in Germany because it was too expensive, because it's really, really expensive to pursue patent rights, especially if you're talking about in every country. So you are a patentee in the U.S. You don't have a patent in Germany. You nonetheless sell products in Germany. Why aren't you now given a license to bring it back into the U.S.? Our answer in that scenario would be exactly the same. If you're a U.S. patent holder and there's no foreign patent at all, you don't have the patent, no one has the patent, you're authorized to sell abroad, again, if you are silent in the sale, we do think that by default, your purchaser gets to assume that it is inquiring all of the rights that you may have. Now, we do think, because your U.S. rights are not triggered, when you're acting abroad, you are not exercising your exclusive rights because those exclusive rights only adhere within the United States. We think if you make very clear that whatever you're selling, whether under foreign authorization, foreign patent or not, when you act abroad, if you make clear, I'm not intending to part to give to you any U.S. patent rights I have in this article, that that sort of express reservation should be held good. But the inconsistency between that and your argument on Mallinckrodt is very difficult to follow. I mean, you say, all right, if you sell in the United States, you can't reserve anything. And if you sell outside the United States, well, we automatically assume that you've given everything up, but we'll let you reserve it. And yet, I'm not sure I understand how you can differentiate between those two positions. It's because of the separate nature of the U.S. and any foreign rights you may have. And let me come at it. What if you don't have any foreign rights? Then the answer is the same, Your Honor. It's because your U.S. patent rights are not necessarily implicated when you act abroad. And let me come at it. But if that's the case, why isn't Jeff Cotto just right the way it is? If your U.S. patent rights are not implicated when you act abroad, then why should there be any exhaustion at all? We don't think they're necessarily, but we think they can be. And we think that's a pretty clear rule that develops through the cases in the common law. And let me come at it this way, Your Honor. We're not advocating a sort of Mallinckrodt-style rule when you're acting abroad. We don't think that a U.S. patentee acting abroad could say, okay, I'm partying with my U.S. rights, but only to the extent you use this a single time in the U.S. We don't think you could impose the kind of conditions this court has suggested in Mallinckrodt R.O.K. in an international scale. The only thing you can reserve are your U.S. rights. And I think it's an all-or-nothing proposition. I think I understand your position, but I'm wondering why you work the presumption the way you do. Given the unique territorial nature of U.S. patent rights and the like, wouldn't it make more sense to assume that if you're a U.S. seller selling abroad, that you're not intending to convey your U.S. patent rights unless you specifically said you're conveying them? Well, your Honor, I think that proposition assumes that the rule is neither never or always, with which we agree. And at that point, you're picking a default. And we have put our default... That's what I'm asking you, and I'm not sure why your default is better than the opposite default. Because it seems like in your situation, you're favoring the purchasers. And saying, unless the patenting was very clear, the purchaser gets all rights. Why shouldn't, in terms of foreign sales, where generally... I mean, except the U.S. patent law doesn't apply, we should assume that when a U.S. patenting sells abroad, they're not intending to convey their foreign rights unless they specifically say so. That seems to me to be a better way of looking at this case. Your Honor, I think that would be a possible way, and the reason we don't think that's the right default is because of the way American cases have dealt with the common law presumption that a seller is partying with all the rights. So I'd refer the Court back to the first case, the Holiday case out of 1885, which said... Let me, let me... I mean, basically your reason is the common law is a sale, an authorized sale, exhausts rights. And that's the rule we should apply, but given the unique nature of foreign patent rights and the like, that there can be a limited exception if they explicitly retain their U.S. rights and make it clear that they're not selling under the U.S. rights. I think that's right, and to be clear, the only exception is for reserve U.S. rights or don't reserve U.S. rights. If we don't think abroad, you can slice and dice up your U.S. rights. Sure, I get that. Yeah, and I do... Again, do you have anything more than just your general preference that the sum of the scale by the general common law favors that presumption versus looking at the presumption the other way, which seems to be favored by probably the patent law? I do think that the common law thesis rests on a pretty fundamental notion about what purchasers get to assume, and moreover, I would notice there could be... And perhaps do a... Pardon? And perhaps do a... I'm sorry, I can't hear that. And perhaps do assume. Yes, and may, in fact... So why would purchasers assume that in light of this current state of the law being Jazz Photo? I mean, Kurt Sang was decided yesterday, and Jazz Photo was decided a decade ago. Why isn't the status quo what we would assume everybody's been assuming? Well, Your Honor, of course, the question is whether or not we should retain Jazz Photo, and we do think that the fairly lengthy tradition before Jazz Photo is what this Court should return to. Returning to Judge Heath's question, I do want to note there can be value for enforcing sellers to be clear. They, of course, are the ones who know what rights they may have or not have, and requiring purchasers to bring the onus on them, it seems a little strange. But you're saying that sellers have to be clear, but the only thing they're allowed to be clear about is whether they retain the U.S. patent rights, whether you can import them into the United States. Everything else, it doesn't matter how clear they are because they're unenforceable restrictions. Well, if they're acting abroad, of course, the foreign law would probably control what they could and couldn't do in a foreign country. But when you got to the United States, if you had parted with your U.S. rights, yes, no post-sale condition. As soon as that article is sold, it moves outside the scope of the monopoly. Thank you, Your Honor. May it please the Court. Mallinckrodt and Jazz Photo have been the law of this circuit for roughly 25 and 15 years, respectively. They were correct when this Court decided them, and they are correct today. Both cases follow from and are consistent with Supreme Court precedent going back to the 1960s. What Supreme Court case supports Mallinckrodt? Well, Your Honor, I think there are several. I think Mitchell v. Foley supports Mallinckrodt. It makes clear that you can have an authorized sale, and then there was a restriction on use. That restriction was violated, and there was infringement liability. That was a license case, wasn't it? There was a sale in that case. Well, yes, there was a sale by a licensee, correct. But, and this goes back to what Ms. Patterson was saying, the contrary position is that there really is no difference between a sale by a patentee and a sale by a licensee. Once there's an authorized sale, the theory goes, all bets are off. Now, what that overlooks, I think, is an authorized sale of what? And that's really what Mallinckrodt is about. The question is, if you've got an authorized sale, do you necessarily have to sell everything? Or can a patentee basically divide up the rights? The case law is pretty clear. Adams, for example, and even General Electric, made clear that patent rights are separable, and they can be subdivided. So what's the difference between that and post-sale restrictions, which the Supreme Court also talks about? So I'm having a hard time reconciling authorized versus unauthorized sales and then the post-sale restrictions. And I sympathize with that, having recently spent a lot of time with the old cases. I think, first of all, I think there's a, part of it may be semantics. It's, motion picture patents is an example where there's something that I would call a true post-sale restriction, where the terms of a license, in that case, besides imposing a time requirement, which was per se unlawful at the time, they also said, oh, and by the way, the patentee can impose subsequent royalty obligations and things that you don't know about yet, but we can do that down the road. That's a true post-sale restriction. I think the kinds of restrictions that you've got in Mallinckrodt, for example, and in this case, they're restrictions on post-sale use, but they're restrictions that were imposed as a term of sale. So they're not that kind of a post-sale restriction. Why isn't the sale by Lexmark, the owner of the patent, an authorized sale? It is an authorized sale, Your Honor, but the question is an authorized sale of what? Lexmark sold the item and the license to use it for a single use, for a discounted price. The purchasers had a choice. What bundle of rights do I want to buy? Do I want to buy the cartridge with the right to use it forever and ever and refill it however I like, or do I want to, like most people do, as a matter of fact, do I want to buy this thing, use it, and then buy another one? And if that's what I want, I don't want to pay for the right to reuse it. Why isn't this particular restriction almost like the tying restrictions that were deemed inappropriate? In other words, you're saying you can only use it once because you've got to buy a replacement. And maybe I'm not saying you have to buy the replacement from me, but I'm assuming that that's going to be the logical result rather than fix the one that or repair the one, we haven't gotten into that issue, that you've already bought. Why isn't this just a simple case, like want to boil down to something much more simple than everybody thought it was going to be, why isn't it a simple case of a tying restriction that's not within the balance of the patent agreement? A couple of responses to that, Your Honor. First of all, the law on tying restrictions has changed a lot, as you know, and in particular in the patent area, 271D5 now expressly provides, in fact, in the absence of market power and antitrust type issues, that in fact tying is not patent misuse. But beyond that, I think the answer in this case goes back to what I was saying a moment ago. Any user who wants the right to reuse a cartridge can get that right. They buy a regular cartridge, and they have all the rights to flow with it, repair, reuse, refill, do whatever you want with it. But for buyers who don't want that right and don't want to pay for it, they basically say, you know what, you keep that right, and I'm going to buy and pay for what I want. So there is no tying here in the sense that anybody is forced or the patent is being used as leverage to force somebody to buy an unpatented product that they don't want. That's not this case. So even putting aside 271D5, which I think makes a big difference in the tying situation, there is no tying here because of the fact that there's this option on the part of the buyer. So if there were no option, it would be an illegal tie? I'm sorry? If there were no option, it would be an illegal tie? No, it would not be an illegal tie. For among other reasons, 271D5. So your argument is the same whether or not there's an option? No. My argument is that you don't even need to be concerned at all about tying because there is no tying here because there is an option. What if there was no price differential? What if it just said, I am going to sign this, and you can't use it other than for one-time use? Period. I think that would be legitimate. That's not what we do. Obviously, it's not this case, but I think that would be allowed. I think that's malicrous, in fact. So it's really not the price differential that matters. It obviously makes the facts look better for your side, but it's not what decides the legal issue. I think it's not legally dispositive, but I think what it does is it highlights the fact, and you've seen it throughout the briefs, this notion of a bundle of rights and the ability to separate the bundle and let people buy the rights they want, pay for the rights they want, and don't pay for the rights they don't want, and that's what we've got in this case. As a strict legal matter, I think that's right, but I think the fact that there is the option here and the lower price I think highlights why these sorts of arrangements are not a problem. Can I ask you, I gather it's undisputed here that you actually sell these things. As a practical matter, when you give one to me, I give you money, and the condition is that when I'm done using it, once I give it back to you, why is that not a lease? Because the... As a practical matter, I don't understand. I gather it's more or less undisputed that if it weren't a sale, we wouldn't even be talking about the cost. Right. I think in a lot of ways, as a practical matter, and putting aside details of the UCC and that sort of thing, it obviously has a lot of similarities to a lease. Now, one difference is that the restriction in Lexmark's contracts is not that you absolutely have to return the carpet to us. It's that if you're going to give it to anybody for recycling or remanufacturing, you have to give it to us. We don't consider it a violation of the contract if a customer tosses it in the garbage. So I think that's one respect in which it's not truly like a lease. Can I ask you a question about general topic pictures? Please. I wasn't quite clear about one thing that the government said. So their Western Electric licenses, who is the manufacturer, their transformation company or something? Automatic Transformer or something like that. And they say, you make these, whatever the devices were, and you may sell them only to people who are going to use them for non-commercial use. Suppose the customer comes to the transformer company and says, I'm going to use this at home. But takes it away and then uses it commercially. Transformer has done everything in its power to make only an authorized sale. But in fact, this device is outside the authorization of the sale. By virtue of a post-sale use, do you understand general talking pictures to say Western Electric retains its patent rights against general talking pictures for the improper use, not withstanding that it may have told Transformer the correct thing? Yes. That is the way I understand it. What the court said there, the court said a number of things, but it said that licenses that restrict use are unquestionably valid and any use beyond the scope of a license is an infringement. Right. The reason I guess that seemed to me important was something a number of my colleagues were saying, is by that mechanism, the patent holder retains patent rights control over downstream uses after the first sale. And a core question is why should there be a dramatic difference, why should there be a dramatic difference, depending on whether it was a non-patentee manufacturer licensee who made the sale versus the patentee itself. That would seem to favor the non-practicing entity patentee over the practicing entity. Exactly. That's our view, Your Honor. Our view is if, as we think is the law, that you could have a licensee make that kind of a restricted sale and have patent rights against a user who violated the restriction, there's absolutely no reason in the case law or in logic why a patentee who sells himself. Except for this more than once unqualified language about authorized sale. And sometimes Supreme Court language goes beyond the facts, and I think it was conceded early on. There is no Supreme Court case involving a patentee sale under a first use, a single use restriction. So everything is a slightly indirect relevance. But isn't there much to be said for the simplicity, the cleanliness of the authorized sale rule, even if there's no meaningful policy difference between the patentee sale and the licensee sale? Well, Your Honor, I think, and not to repeat myself, but I think you have to ask an authorized sale of what? In both General Talking Pictures and in Mitchell v. Hawley, the court was very clear, and it said that the licensee cannot convey more than what he has. And so when you have a licensee, as in General Talking Pictures, who's limited in, you know, you can only produce this for commercial use, can only be used for commercial use, he can't give more rights than that to a downstream purchaser. Yes, but when the patentee sells, the patentee has full rights, and if it makes the sale, that's an authorized sale, and why can you impose downstream restrictions under those circumstances? Because there's no reason, and there's no case that says that when a patentee sells, it has to sell everything. But Mitchell v. Hawley was an easy case, wasn't it? I mean, that's a situation where you had different sections of the patent term and only want, you know, a patentee can say, I'll sell you this for use during the first five years, and then maybe you don't have it for the whole patent term. That's a very different animal than saying I'll sell it to you, but during those five years, you can only do this with it versus that. Well, I agree with you that the Mitchell v. Hawley case, and I would say also a single-use case is easier in that sense, but I don't think that doctrinally there's any reason or really practical way to draw a distinction between that kind of thing or the general talking picture situation where you can use it at home, but you can't use it in a movie theater. Same piece of equipment, or at least the same patented invention, but you can't use it for different purposes. I think the law recognizes those kinds of distinctions, allows patentees to draw those kinds of lines. And it's true that a durational requirement or a single-use requirement is easier to think about, easier to track maybe, but I think as a legal matter, it's the same thing. Does the record tell us whether your client books the one-time use cartridges differently as an asset than the refillable? The record does not. Your Honor, as you probably know from the brief, this was decided on motions to dismiss. Essentially on the pleading, there is a limited factual record, but nothing of that nature. I'd like to turn for a moment, if I might, to the jazz photo question. This court in Helfrich and in Lifescan and other cases has said that the core principle of exhaustion is that a sale of a patented product lifts the legal restrictions that would otherwise constrain what the buyer could do with the product that he just bought. Now in the U.S., a patent would normally preclude any use of the product, but so the law presumes in the U.S. that an initial authorized sale, putting aside the debate about what authorized sale means... But Mr. Trello, let me just push you straight to the issue, which is why doesn't Kertzsang govern? I mean, who cares what we said in all the cases that led up to Kertzsang, because why isn't Kertzsang the end of it for all of us? Kertzsang's not the end of it for a bunch of reasons, Your Honor. To start with, Kertzsang, and state the obvious, the elephant in the room, as Judge Lord put it, it was a copyright case, but more than that, it was a statutory construction case. Kertzsang turned on the meaning of five specific words in Section 109A of the Copyright Act, lawfully made under this title. The court answered that statutory construction question by looking at the statutory language of that provision, its predecessor and other provisions in the Copyright Act, the legislative history, and I want to disagree with Mr. Pincus, the starting point in Kertzsang was not the common law. The starting point was the statute. The court looked at the common law as a tool in its statutory construction exercise. After it went through everything else, it looked to the common law to say, well, okay, we haven't found anything so far that has a geographic limitation. Is there anything in the common law that we should assume Congress intended to import? So really, the common law was more of a footnote on the analysis than the starting point. No, because they wanted to see if there was something in the statutory language that compelled a different result. They went through all of that. They said, no, so what are we left with in the absence of any statutory prohibition? We're left with the common law. So if we don't have in the Patent Act, similarly, if we don't have statutory prohibition, why are we not left with the common law that Justice Breyer talked about, Kertzsang? Because I disagree with, I think, where you started, Your Honor, and that is, in Kertzsang, it was not that the court saw no prohibition there. The court found that the act was affirmatively non-territorial, that it reflected a judgment to not be territorial. And I think one of the clearest examples of that is the court looked at the predecessor of Section 109A, which was plainly not territorial, just in its language, and it said, is there any indication at all that when Congress changed this language in 1976 or whenever it was, that it intended to change from what was plainly a non-geographic exhaustion rule to one that was territorially limited, and the court couldn't find any evidence of that. So I don't think that... What is our threshold question under the Patent Act, whether it's territorial? Well, I think the Patent Act is territorial in a way that the Copyright Act is not. First of all, copyright law is very different, as the court knows. It does not depend on examination under the laws of a particular jurisdiction. A copyright comes into existence when a work is created, wherever it's created, at least under the signatories to the Berne Convention, which is 180-some countries, I think. Under the Paris Convention and U.S. statutes, patent law, on the other hand, is very territorial. Patent rights differ from country to country. You can get broad patent coverage on inventions in this country. You might not be able to get a patent at all in another country. Even the United States has conceded that patents are territorial. Right, exactly. And Judge Lurie, you raise a good point, and that is that the government's position, as you said, is that patents are territorial, and in fact, that's the position the political branches have taken in trade agreements and other treaty negotiations. But the logic of that position seems to lead to a default rule that ought to be that there's no exhaustion from a foreign sale, because really, the U.S. patent has nothing to do with the foreign transaction at all. And going back to what I started to say a moment ago, if the kind of underlying premise of the exhaustion doctrine is that it's intended to lift restrictions that would otherwise restrain what a buyer can do, well, that explains why the default rule in the U.S. is, well, if you sell in the U.S., you have exhaustion, because otherwise you've sold something to somebody and they can't use it, and that doesn't make any sense. But in a foreign country, the U.S. patent doesn't impose any restrictions at all on what the buyer can do with what he just bought. There may be restrictions in the foreign country, and depending on foreign law, perhaps those restrictions are exhausted, but the U.S. patent is not in any way constraining what the buyer can do, and so there's no reason to presume that a transaction in a foreign country would be automatically lifting those restrictions. And we've mentioned that there may well be no patents in countries where there is a sale by the U.S. patentee. Exactly, Your Honor. So there's no sense in which, even when there is a U.S. patent, I don't think there's a, it's fair to say that when the U.S. patentee sells overseas, he's somehow being compensated for U.S. patent rights, but clearly when there's no U.S. patent or when the foreign patent, the coverage of the foreign patent is very different than the coverage of the U.S. patent, which often happens, it doesn't make any sense to say, well, you sold it in France or the Philippines and therefore you've given up your rights in the United States, your rights under a very different legal system, very different laws, and possibly very different patent scope if you even had a patent in the Philippines. Well, does it matter then if you're selling it expressly under a foreign patent or if you're just selling it and you have no foreign patent? I don't think it matters. Our position is it doesn't matter, Your Honor, because again, even if you have a foreign patent, the rights that you're being compensated for giving up are those foreign rights because your U.S. rights are not having any impact on that transaction. They're not constraining what the buyer can do in that country. So you're saying if you sell and you have no foreign patent, so you sell a product that would be protected in the U.S. by a patent, you sell it in a foreign country, you're not actually selling your bundle of patent rights, you're only just happening to sell a product that might be covered under that bundle of patent rights if in the United States? I think that's right, Your Honor, because you, in fact, in that foreign country, you don't have a bundle of patent rights. Your patent rights are territorial. They exist in this country. They don't exist in France or the Philippines or anywhere else. So that's why a transfer of those U.S. patent rights is not a necessary part of a foreign transaction the way that it would be in a transaction in the U.S., depending on the terms of the transaction. Well, you don't really think that it would be true that at least our follow-on cases to Jazz Photo say that you could never exhaust foreign patents. No. And I don't think that's what, and I know that's the way the bank question is stated, I don't think that's what Jazz Photo held. Those weren't the facts presented in Jazz Photo. So I certainly don't read Jazz Photo that way. I don't think... You don't have that. I'm sorry? Later cases held that Fuji Films read Jazz Photo to say that, but... Well, I think so, but again, Your Honor, even in that case, I don't think there was any attempt to transfer U.S. rights. So we don't read any of those cases as presenting an obstacle. You know, if the seller in the foreign country also has U.S. rights, and they want to transfer those rights, I don't think Jazz Photo or any of this court's other decisions stand in the way of that. Getting back to Judge Moore's question about curtsing, a part of the analysis there that led to the result were kind of policy practical concerns about importing a car that covers a thousand patents and that sort of thing. Those arguments are at least as great, those issues are at least as punctuated in the patent area as they are in the copyright area, are they not? Well, you could certainly have those kinds of issues in theory in the patent area, Your Honor, and I would make a couple of comments about that. One is, Jazz Photo has been the law, as I've said, for about 15 years in the circuit. It's very clear, putting aside whether it says you can never exhaust, and it has not caused any problems. That's one. The other thing is, Your Honor, and this is clear from the amicus group... Well, it's not clear that the Copyright Act was presenting any of those problems either, right? Well, that's probably right, Your Honor. But again, when you're talking here about, and this was not true in curtsing, we've got stare decisis principles here, you've got clear law of the circuit, and as the Supreme Court held just this last term in Kimball, you need, as the Court said, I think Justice Kagan was being a little tongue-in-cheek, but super special justification to turn that aside. So, in the absence of any evidence of any real problems... And the other thing I would say, Your Honor, is that the amicus briefs make clear, and in fact, most of the amici on the impression side, they talk about, well, we have global supply chains and this can create all sorts of problems, but almost to a party, they make clear, well, yeah, but we have global licenses and that's why this, in fact, isn't a problem because we get global licenses. And so if products are going to come into the U.S. or other foreign countries, we take care of that by having licenses under all the relevant patents. Can I ask you a question about cursing? Was that a conditional sale? I don't think it was a conditional sale, Your Honor. There was a, apparently there was some sort of a legend printed in the book, but there was no suggestion in any of the briefing or obviously in the opinions that there was a meeting of the minds or any sort of a valid contractual limitation. And here, of course, we have a stipulation that there's a valid and enforceable contract. So, no, I would not view that as a conditional sale case. But why is it not? I mean, right on the book, it said, you can use this in Asia and not elsewhere. Well, because there was... I forget whether it was use or sale. It doesn't matter. Right, right. Because I don't think that, in a sense, it's like, in that sense, I think it's probably like quanta, where, yeah, there was this notice, but there was nothing conditional on it. Nobody had to agree to the condition before the sale, which is a difference in this case. And I think it's what the court was getting at in quanta when it actually went through the agreements and said, you know, Intel's right to sell was unconditional and unrestricted. And the fact that it had to give notice that there was no license to the ultimate purchaser, that didn't make it conditional. I think the same thing is true in curtsaying. See that I'm almost out of time. I'm happy to answer any questions. I have a question for you. I appreciate your point for international exhaustion that a sale outside the U.S. wouldn't, in some way, implicate U.S. patent rights since it's outside the United States. But have you given any thought to footnote six in quanta, where it was said that Univis teaches that the exhaustion question is whether the product is capable of use only in practicing the patent, not whether those uses are infringing it. What's your response to that? The response, Your Honor, is that footnote six in quanta was not talking about patent exhaustion. It was talking about whether the invention, the product being sold, was a substantially embodied, these were method claims, the chipset substantially embodied that and therefore could be considered a sale of a patented product. And in fact, you'll note in footnote six that the court says if there were a sale abroad, then LG argued that that would be a substantial non-infringing use and therefore there's no substantial embodiment issue and the court rejected that argument but for reasons having nothing to do with exhaustion because there was a foreign sale. And in fact, both parties in their briefs in quanta, LG at footnote 19 and quanta's reply at footnote two made a point of saying the question of foreign exhaustion isn't presented in this case and the Solicitor General in his brief, footnote two, said the question of foreign exhaustion isn't presented and by the way, Boshler's graph concerns, governs any question of foreign exhaustion. So I don't think that footnote in quanta sheds any light on the jazz photo issue, Your Honor. Thank you. Thank you, Your Honor. Help me with your name. My name is Barbara Fiaco on behalf of Biotech Industry Organization and CropLife International. And thank you for the opportunity to speak on behalf of these amici. And these organizations have members that invest billions of dollars in R&D and a range of products from healthcare, agricultural, environmental, and industrial products. We know who you are. Okay, I want to underscore that because our members feel very strongly that this case and I think they appreciate this goes far beyond the question of printer cartridges or even software or cell phones so I want to address international exhaustion first because it's an important doctrine, an important issue for our members. Many biotech products are sold at lower prices in developing countries. Just a question that if we thought that the question of international exhaustion was not either never or always but one of two choices in the middle, why the default rule should be the government's or Mr. Trella's? We fall down on the side of Mr. Trella's and believe that it shouldn't be and I think this is a point that Lexmark makes in their brief that you shouldn't be able to convey a multinational license through silence. That there ought to be, this is a bundle of rights. It's a territorial U.S. bundle of rights. Well, what's the problem with providing notice? What's the problem with providing what? Notice. I'm not sure. What's the problem with providing notice if you want a reserve? Well, I think that... I mean, you're the patentee, you're the seller. You're in a better position to know what rights you have, what rights you don't have in various countries and what rights you intend to convey as opposed to the buyer who presumably thinks when they're buying something they have the right to use it wherever and whenever. Doesn't it seem like, as the government pointed out, that the onus should be on the patentee and the seller if they want to preserve rights? I'm not sure that a purchaser, let's say in Germany, who's purchasing the product necessarily makes the assumption that they're acquiring U.S. patents. Yeah, but what's the problem? Why is it a big problem on the seller to provide notice? Would it maybe not be such a big problem prospectively? Well, wait, wait. Could I get the answer to the question? What is the problem with providing notice? Well, it upends settled expectations and where we are right now, which for over 15 years has been that the expectation is that we're not conveying a U.S. patent and we're not making sales. Okay, so now you're telling us we have to provide notice. What's the problem of providing notice? Why is that so burdensome? Well, there is the retrospective problem there. From our perspective, also, there's a lot of different sellers here. This isn't the situation of the LG supply chain as they describe it, where there are sophisticated parties that are all working together in a supply chain that can address the issues and they're doing their diligence. We're just in a very different situation. It seems to me that the question of retrospectivity that you've adverted to has very much to do with how often the U.S. patent owner has the ability to alter the contract for the next batch of units sold. I realize it's a highly general, maybe even speculative question, but if we're trying to assess the magnitude of any retrospective effect, how do we figure out whether there may be a little but pretty much new notices can take care of giving the patent owner retention of U.S. rights pretty easily, even by changing the license agreements or by now giving notice within the current license agreements? How do we figure that out? I think the problem that we have is that we need to address downstream purchasers with whom we... I guess the issue that we're raising is downstream purchasers with whom we've had no contact in which there is no notice. The reason that we feel that foreign sales shouldn't exhaust U.S. patent rights is that we need a way to enforce regional pricing and prevent arbitrage. The concern that we have is that there are these aggregate importers out there who could look for opportunities to purchase products. I think I understand the problem of not being able to engage in international price discrimination of a quite socially beneficial sort. I get that. I'm just focusing on the question. Let me just pose a hypothetical. Most of the products you have out there are relatively short shelf-life products. Yeah, you may have a problem with respect to those, but they're not going to be sold for very long anyway, so most of the new products will be under new sales agreement and you can control the terms of the new sale agreement. Is that likely true? Is it implausible? Just on this retrospectivity question. I think it would be a very complicated thing for the range of products that these organizations represent to make a generalization. And maybe some of the products are not as short shelf-life. Moreover, if your clients are selling in 150 countries, they're selling under the laws of those countries which may require various kinds of drug approvals and you may not be able to put the reservation of rights. They may not let you do that. Isn't that possible? Yes, sir. That's entirely possible, Your Honor. Thank you. Thank you. Thank you. I just want to mention one thing I read on the box. I do believe Kersang does control, regardless of what we may think about whether it should or shouldn't, Kersang does control. The particular statement in Kersang is the following. The common law doctor makes no geographical distinctions. Now, they're talking about the common law. How about location of manufacturing? It must have been because there was no issue there as to location of sale, was there? Correct. The common law to which they're referring is the 1620, I believe it was, statement by Lord Koch which, and it hasn't, for some reason doesn't get discussed much, was the LifeScan case. And the LifeScan, which I thought was one of the better cases in this area of the law, right up there with motion picture patents, clearly identifies that the basis for the Coors decision in Kersang was the determination made by Lord Koch which was adopted, not specifically to any particular type of property but as the general common law. And apropos of this notion that the decision in Kersang was made on copyright law, it just wasn't. That was in the nature of an affirmative defense. So they said, here's the general rule. But they were interested in the copyright statute. To see if it provided an affirmative defense. In a very narrow aspect of the statute. Correct, that's right, exactly. And they did not say, we extend this to patent law. No, they didn't say that. But this court did in the LifeScan, said it extends to patent. And they also cited, again, to Bauer versus O'Donnell in 1913 which says that copyright law often educates us or teaches us what should be done in the context of patent law if it's an appropriate circumstance. I know there are differences between patents and copyrights. To me, those differences are not relevant to the legal principle here. So, with regard to the... To the extent that there exists, though, in patent law, a status quo. Perhaps I won't go so far as to walk with storied deficits because last time I went there I didn't fare so well with the Supreme Court. But is Mr. Trella nonetheless right that in patent law, at least for the last 15 years, the settled expectations have been such that there is no doctrine of international exhaustion? Would that sway the application or applicability of Kurtzsang at all? Well, I guess part of it depends on how we look at 15 years. When that case came down, it seemed like it was yesterday to me. 15 years in the context of this law is yesterday. Prior to that, we had like over 100 years of well-settled law, which was just the opposite of jazz photo. And with all kinds of cases, mainly the Curtis case, I dealt with that in 1969 when I was with the judge at the general's office of the Air Force. Am I understanding right? We basically have about six cases on this subject. Roughly. Maybe you count Bosch, maybe you don't count Bosch, but you have the two Mercedes cases and you have the Curtis case and what, two others or something? Dickerson, Matheson, and Dickerson. Every one of them is consistent, is it not, with the rule that the government describes the cases as standing for? No. Namely, defeasible exhaustion by an international setting. And by defeasible you mean they can put a restriction saying, I'll reserve my... There's only one that did that, and that was the Dickerson versus Kingling case. And none of them said you cannot, with a sufficiently clear reservation of your U.S. patent rights, retain those rights after an authorized foreign sale, did they? That's correct. They did not. They did not. So, if I may address what the government did in that case and whether we call it being whatever we want to call it. But the government took, first of all, the position that you can't put restrictions on property, and that's when they were taking issue with this court's decision regarding a license on a product and telling people what you can and can't do with it. They give no reason why that same determination should not also extend into an international sale. There's no reason why those rules should be different if, in fact, as the court said, the common law doctrine makes no geographical distinctions. There has to be a reason in the law for the distinction. Can I ask you a question? I don't remember what was in your gray brief, but I think in the red brief, Mr. Trella says, we think the default rule ought to be the opposite of what the government says. But if it's what the government says, we think there's enough here to indicate that we actually did reserve our rights. Did you take issue with that in your gray brief? I did not, because that would be an issue on reconsideration. We disagree with that, and I think it's clear from the context in which he's talking there is they're saying that based on their advertising, based on what's on their packaging, because they did make those arguments, that that somehow constituted a reservation. But I don't think there were any explicit contracts where people went into a store to buy a product and signed the contract and said, when I agree, so-and-so. That's not the way these products are sold. They're sold off the shelf. I'd like to address your concerns, if I may, Your Honor, about the issue of the safety, health and safety, welfare type thing. And I understand... Or any other reason. I think this is really what concerns me about what we're discussing. We aren't considering the implications. We aren't considering the practical effect on the vast body of technological issues. And particularly in Mallincroft, there was a lot of emphasis on the justification for the restraint. And as I listen to what we're saying, I wonder, isn't that what we're dealing with, the justification for the restraints that are here being challenged, rather than school's out, you can't do it, never mind, enter the jungle? Well, I understand your concern. And I remember when Mallincroft came down, a lot of people were thinking that it was based entirely on that concern, which I don't believe it was. First of all, think of it in terms of practical context. You're in a courtroom, and the other side has raised the issue that, well, we need this for health and safety reasons. Is it going to be a determination by the jury as to whether those really were restrictions necessary for health and safety purposes? How do we reach that determination? In Mallincroft, they said that, but as far as I can see, they never proved it. So that would lead us into a mini-trial in each and every one of these issues. The other aspect of it... But the result, though, your opposite result, is that we would never give any consideration to that. Or with respect to the biotech industry, we would say they can't sell to universities for limited purposes, for research and for other purposes, that they sell for very cheaply, because if they do that, then they've lost all their rights. They've lost their patent rights. That's patent rights. These issues can be addressed by contract. So if you sell a product to a university and you say, use this only for research purposes, and that hospital takes that and starts selling it on the side for commercial purposes, they are infringing your contract. Contracts are tamable animals. We know what happens with a contract. You write a contract, we have specific... But the remedies are dramatically different, are they not? Absolutely, and that's the point. You can put any remedy you want to in the contract. You can put all of your patent remedies into a contract as well. There's no limitation as to what you can do. You have far greater flexibility in the contract situation than you do in the patent situation. The issue is really, in the real world, is not between the seller and the purchaser when you're talking about corporate entities or businesses. The issue is what happens when someone downstream buys a product, and that's why there's so much concern with so many of the amici on our side. So we shouldn't worry about the fact that there's a need for HIV drugs to be available to those who can't afford them. Right? Well, I don't think that's, again, the proper province of the patent laws. Congress can deal with that, and Congress can change the patent law in that regard if it wants to. But those are issues, just like in this situation, we have a Food and Drug Administration whose job it is to deal with these issues. Exactly, and what bothers me, in the real world, all right, we'll budget $1 million for research, $100 million for the lawyers, and we'll go about our business fighting. I mean, we need some simple, straightforward understanding rules where at every step you take, you don't have to write another 50-page contract. That's correct. It's also true that we don't want to get into side issues as to whether or not these really are valid extra considerations in terms of enforcing patent rights. Well, but that Supreme Court's Curtain decision was, in no small part, based on policy considerations that they analyzed, and they were thinking about the library book or the book someone buys at the airport in Denmark, and then they hop on a plane to the U.S., and how could they possibly be guilty of copyright infringement when they bought the book in Denmark and brought it to the U.S. in a car with the software? I mean, doesn't the different circumstances, and in particular the impact that this will have on pharmaceutical products, create a very different set of policy considerations that maybe take us outside the umbrella of Curtain, namely the importance, the extreme importance, of low-cost AIDS drugs in Africa, for example, the need for differential pricing that exists in that circumstance that maybe is not so compelling with the Korean textbook versus the U.S. textbook, but perhaps the Supreme Court would see these policy considerations differently. I don't believe so, and I think the Supreme Court addressed all those policy considerations in great detail and said they were unpersuaded by those. What if Lexmark had licensed another company to make and sell these cartridges with a restriction on the scope of that license to sell that with just a single use? What would happen there? Well, I think you would have... I think you'd have the same issue, because if I... I guess why... I give you a license. I just repeated the general talking picture of FACFAP. Right, of course. So I give you a license. You can sell that product in a limited scope, and you sell that, again, to a person who is going to use it or refuses it. And one thing, I'll just digress for one second. General talking pictures never talked about the effect, as a legal matter, of the knowledge by the purchaser. They said you knew, but they never said what impact FACFAP had. I think that's still an open question. But if you... Let's say you do know, and you buy something from somebody who has a restricted limitation, and you use it outside of that scope, then I think you're guilty of patent infringement, because it's not an authorized sale. And I hate to come back to that, it seems simplistic, but that's the term that's used over and over again, and that's what controls. Thank you. Ruth St. Paul Counsel, on behalf of my colleagues, and the FACFAP staff, for the heavy lifting it took for the two en bancs today. The case is submitted, and concludes our proceedings. All rise.